IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Tony Tremayne Lewis
                    Plaintiff

v.                                              Case no: 23-3236-JWL

Kansas Dept of Corrections
                        Defendant

## Motion to file 2nd Supplemental Claims

The Plaintiff comes now requesting that this Court accept his additional claims. Attached with this motion is the required paperwork (another Amended 1983 complaint)

The Plaintiff wants to introduce into his already existed complaint 3 additional incidents involving several violations of the Plaintiff's constitutional rights.

Most of the defendants the Plaintiff comes now discussing were previously dismissed in this court's most recent judgement order, however, due to the facts and evidence presented herein, the Plaintiff believes this court should reinstate those Defendants and hold each one under their respected liability.

The Plaintiff has only amended his 1983 complaint once and when he did the Defendants weren't given any service order yet. The reason the Plaintiff could not impliment the claims herein (then) was because the Plaintiff couldnt provided some necessary documentations in order to show good cause why the claims are indeed unconstitutional.

Armed now with those particular documentations, the Plaintiff comes now argueing the following:

## Count 7:

Background: During the month of March of 2023 the Plaintiff was being held at El Dorado Correctional Facility and was housed in one of the Restrictive Housing Units (RHU). The Plaintiff's cellmate during this time was a notoriously violent inmate named Alfonso Briscoe # 66034.

On March 16, 2023 the officer's duty was to conduct showers for the Plaintiff's side of cellhouse. Before March 16th of 2023 the last time the Plaintiff and his cellmate were allowed to shower was three days prior.

Before the cellhouse officers made it to the Plaintiff's cell, the Plaintiff and his cellmate had agreed that Briscoe would leave to shower and the Plaintiff would stay in the cell and bathe out the sink, so he could prevent their property being destroyed or lost as a result of a lousy cell search.

The officers conducting showers on March 16, 2023 were CS1 Shawn R. Chastain and COII Alexander Owens. When CS1 Chastain came to take cell 151 to the showers (cell 151 is the Plaintiff's living quarters) he looked inside and noticed that there was a sheet drapped on the Plaintiff's bed area. Because of the sheet drapped on the Plaintiff's bed area, CS1 Chastain deceided to take away shower priviliges for not only the Plaintiff, but also inmate Briscoe — who stood at the door dressed ready for showers.

1.

As the officers bypassed the Plaintiff's cell and began to take out the inmates in the next cell, Inmate Briscoe became angry and yelled out for the officers in return so he could shower, for he had no infractions pertaining to his bed area.

When the officers didn't answer him, Briscoe turned to the Plaintiff and vehemently suggested he get [them] to come back so they could let him shower.

For several minutes the Plaintiff shouted out the door stating that it was an emergency, but CSI Chastain and COII Owens disregarded the tone of his pleas for help.

After a while COII Owens came to see what the Plaintiff needed and it was then that the Plaintiff tried to explain that they couldn't disallow his cellmate from showering behind something as minor as a sheet that was dropped on the bed of the Plaintiff. During that time, CSI Chastain came over to see what the fuss was about.

The Plaintiff's cellmate then began tell CSI Chastain that he wanted to shower, and that his right to shower couldn't be taken away for something the Plaintiff was accussed of doing.

Despite the sense of everything said to the officers, CSI Chastain said "no," and refused to let inmate Briscoe take a shower.

At that moment Inmate Briscoe grew livid and told the officers that if he couldn't shower he was going to fight the Plaintiff.

The Plaintiff grew nervous and began to fear for his safety after hearing that, so he went to the door and requested to be separated until they found another cell to put him in.

Both officers refused to separate the Plaintiff from his cellmate, despite the clear threat which was made by inmate Briscoe.

The Plaintiff again voiced reason to be separated, but CSI Chastain told him no, then looked at inmate Briscoe and said "your responsible for your own actions." And with a smirk he walked off and resumed showers.

A few minutes later, Inmate Briscoe was witnessed assaulting the Plaintiff up against the cell door.

An emergency call was made on the radios and it was then that the Plaintiff and Inmate Briscoe was seperated.

The Plaintiff had a bleeding lip as he was accessed by the nurse and another officer also named Owens.

The Plaintiff was put back in cell 151 alone, and his property and legal mail was confiscated and held for approx. 5 days.

The next day the Plaintiff was given a disciplinary report for alledgedly fighting. See Exhibit Y1 However, the charge was dropped due to inmate Briscoe admitting he was the aggressor, and that Plaintiff never fought back. See Exhibit Y.

The Plaintiff filed a grievance on CSI Chastain and COII Owens about the incident and requested $150 worth of canteen items to rectify being assaulted, when the assault could have been prevented.

The grievance was denied behind false claims. See Exhibit Y3

The Plaintiff appealed the denial to the Kansas Department of Corrections' Secretary of Corrections, but that too received an erroneous denial of remedy. See Exhibit Y4

## Arguements, Authorities, and Liability of Defendants

The moment Inmate Briscoe threatened the Plaintiff with bodily harm, it was a duty of CSI Chastain or COII Owens to remove the Plaintiff from the risk of harm.

And its because they didnt, that[that] disregard of safety became a consitutional violation.

See Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir 2008): "The Eighth Amendment's prohibition of cruel and punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care and reasonable safety from serious bodily harm."

Due to the facts of this situation this court cannot say CSI Chastain and COII Owens were not deliberately indifferent to the Plaintiff's right to remain safe from obvious risks of serious bodily harm.
See Farmer v. Brennan, 511 US 825, 834, 114 S. Ct 1970, 128 L. Ed 2d 811 (1994)
   " the prison official must have a sufficiently culpable state of mind to violate the constitutional standard. The standard of culpability necessary to an Eighth Amendment violation is one of deliberate indifference ...
A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety "
   CSI Chastain was the ~~sughas~~ supervising officer, on March 16th 2023 and was made aware of the threat the moment he heard Inmate Briscoe express it, toward the Plaintiff; and as the supervising officer CSI chastain had an official duty to 1) remove the Plaintiff from the excessive risk which he created.
" He " being CSI Chastain, and 2.) discipline Inmate Briscoe for the threat made to the Plaintiff; he did neither.
KAR 44-12-306 ( Threatening or Intimidating any person ) is a regulation CSI Chastain is familiar with, and it partial states: " An inmate shall not threaten or intimidate, either directly or indirectly any person or organization."
   Another prison regulation both Chastain and Owens should have been familiar with is the Kansas Department of Corrections' Internal Management Policy and Procedure number 01-100D subsection of " Mission, Vision and Beliefs " ~~states~~ which states : " Our Vision ... Fostering dignity and safety by establishing practices and policies that honor individual differences with mutual dignity and respect and all feel safe and supported ."
   The disregard to the Plaintiff's safety by both of these Defendants was in contravention to the IMPP stated above.
   This court must be advised, the Plaintiff's cellmate ( Inmate Briscoe) was a documented gang member with a very violent prison record, who is serving a life sentence for murder; which are all reasons they should have took the necessary precautions to prevent Inmate Briscoe of making good his threat toward the Plaintiff.
   There were isolated places within the unit the Plaintiff could have been placed, but the prison officials refused to entertain that option, despite the numerous pleas from the Plaintiff to do so.
   The Tenth circuit has held clear admonishments toward the type of adverse actions CSI Chastain and COII Owens effected the Plaintiff with, on March 16, 2023, See Harris ex rel. Harris v. Maynard, 843 F.2d 414, 416 (10th Cir 1988)
" Where one's very right to life is at stake and where prison officials control the conditions of confinement thereby reducing the prisoner's ability to protect himself, it takes no great acumen to determine that, constitutionally, prison officials may not exercise their responsibility with wanton or obdurate disregard for or deliberate indifference to the preservation of the life in their care ... The same is true under the Fourteenth Amendment due process clause... We conclude that wanton or obdurate disregard of or deliberate indifference to the prisoner's right to life as a condition of confinement is a substantive constitutional deprivation whether it falls under the due process clause or the Eighth Amendment. "
   This case, isnt a claim of "excessive force", but it is a constitutional claim addressing " wanton disregard "...
to a prisoner's safety. And it was because of that wanton disregard [this prisoner ] was harmed.
   Defendants CSI Chastain and COII Owens are liable for the violation of the Plaintiff's Eighth Amendment rights. See Haley v. Gross, 86 F.3d 630
   In the Haley case, Haley was awarded a very large ~~re~~ remedy for prison officials' wanton disregard to his safety. Just like the Plaintiff, the officials were called to the cell and things were said which created awareness that if no care was implied, something harmful was going to occur. And just like in Haley v. Gross, the Plaintiff repeatedly requested to be moved away from his threatening cellmate.
   The court in Haley v. Gross pointed out - " Thus Haley did not need to prove that any of the defendants intended that Wilborn harm him or that they actually believed that Wilborn would harm him. It is enough for Haley to show that the defendants actually knew of a substantial risk that Wilborn would seriously harm him. "Wilborn was Haley's cellmate.
   The Plaintiff didnt get severally burned as a result of these defendant's deliberate indifference, however, he did get harmed ... and was effected physically by that harm inflicted. See Exhibit Y2
   The Plaintiff has ~~successfully~~ stated a claim of Deliberate Indifference.

- Count 8: Defendant ~~with~~ Isaiah J.O Barker

Background: On June 6th 2023 the Plaintiff was being held at EL Dorado Correctional Facility and was being housed in B cellhouse - one of the facility's Restrictive Housing Units. On this day at approx 3 pm the last meals prepared by Aramark were brought to the Plaintiff's cellhouse so each inmate could eat dinner. During that time the Plaintiff resided in cell 151 and was ~~evoned~~ snuggled inside his "sleep system" taking a nap.

As the Plaintiff slept he was passed up by the Defendant Isaiah J.O Barker, as col Barker passed out the dinner trays. As the Defendant then after begin to collect the dinner trays the Plaintiff awoke from the sound of him emptying food and garbage in the trashbin. ~~Consecutive. However during that time but when the Plaintiff was awakened by the Defendant.~~

The Plaintiff confronted the Defendant about his dinner tray, asking col Barker why he didnt get woke up so he could receive his supper. The Defendant lied to the Plaintiff by alledging he attempted to wake the Plaintiff up but did not respond. The Defendant claimed he took the Plaintiff's silence as a refusal to eat his meal.

Upset, the Plaintiff seeked out the cellhouse supervisor CSI Thompson and stressed to him he was maliciously denied dinner by the Defendant Isaiah J.O. Barker. CSI Thompson didnt get the Plaintiff a dinner tray like the rest of the inmates, however he gave the Plaintiff a small bag of plain flavored chips, and a small brownie.

The Plaintiff did not receive any substantial protein or any minerals ~~from~~ from vegatables.

Upon information and belief the Defendant refused to feed the Plaintiff dinner because the Plaintiff had been previously disciplined for a battery against staff; and because so, the Plaintiff filed a timely grievance requesting to receive $100 in commissary as a form of remedy. But before he requested the commissary the Plaintiff simply requested to receive an extra meal on "Hamburger Saturdays" and on "Pancake Sundays".

See Exhibit Z

In his grievance, the Plaintiff specifically requested the "fact finder" to ~~review~~ review the security footage in B cellhouse during the time dinner was passed. The Plaintiff was adament the camera would show the opposite of what the Defendant Barker had alledged.

The fact finder of the Plaintiff's grievance denied the grievance, without reviewing the security footage.

See Exhibit Z1. The Plaintiff appealed the grievance to the Defendant Warden Tommy Williams; but it was denied.

The Defendant Jeremy Hoepner was the prison offical who acted as the fact finder for the grievance CA22890.

The Plaintiff appealed the decision of Mr. Hoepner to the Secretary of Correction and his "designee".

In the Plaintiff's petition to the Secretary of Corrections, in regard to grievance CA22890, the Plaintiff warned them of legal trouble for them if they continued to disregard their obligation to review the camera for June 6th 2023.

See Exhibit Z2 and Exhibit Z3

Despite the warning of litigation through civil suits, the Secretary of Corrections Designee deined the grievance, and again (the Kansas Department of Corrections) did so without properly investigating the complaint.

## Arguements, Authorities, and reason for Liability

"Failure to adhere to federal law, your state's administrative regulations and your agency's policies and procedures is evidence of malicious intent to violate our rights." Pell v. Procunier 417 US 817 (1974)

On June 6th 2023 The Defendant Isaiah J.O Barker claimed he attempted to awake the Plaintiff during meal pass. He also stated that due to the Plaintiff being asleep and unresponsive he interpretated [that] to mean the Plaintiff did not desire to eat dinner. Even if that were true, Mr. Barker's actions did not reflect proper policy.

See Exhibit ___ All officers working restrictive housing units are required to know to alert the shift's captain and medical whenever an inmate is unresponsive during meal pass. To carelessly assume they are sleeping peacefully with wishes to be undistrubed is against rules and regulations.

However the truth of the matter is that, the Defendant Mr. Barker purposely passed up the Plaintiff during meal pass so the Plaintiff could suffer by hunger.

The Defendant Mr. Barker violated the Plaintiff's Eighth Amendment right by using false claims to deprive him of adequate food.

See Clemmons v. Bohannon, 918 F.2d 858 (10th Cir 1990) (quoting Rhodes v. Chapman 452 US 337)

"A prisoner's conditions of confinement may constitute punishment prohibited by the Eighth Amendment unless such conditions ~~a prisoner's conditions of confinement may constitute punishment prohibited by the~~ are "part of the penalty that criminal offenders pay for their offenses against society."

Being deprived of the prison's daily meals is not part of the penalty the Plaintiff was sentenced to endure; in fact, the Eighth Amendment prohibits such deprivations, Inmates of Occoquan v. Barry, 269 US App DC 210, 844 F.2d 828, 836-839 (DC Cir 1988) ("deprivations" that trigger eighth amendment scrutiny are deprivations of essential human needs --- food, shelter, health care, and personal safety)

When Mr. Barker choose to deny the Plaintiff the opportunity to accept his dinner tray he <u>triggered</u> an Eighth Amendment scrutiny by subjecting the Plaintiff to an ~~undue~~ Unusual and atypical hardship. Thus, proving that the Plaintiff has stated a claim under the Eighth Amendment.

- The Defendant Isaiah J.O Barker is also responsible for violating the Plaintiff's rights under the 14th Amendment.

   The Fourteenth Amendment to the Constitution guarantees everyone "equal protection of established laws"

   Equal protection means that a prison or a prison official aren't allowed to treat one or some prisoners differently than they treat other similarly situated prisoners.

   On June 6th 2023 the Plaintiff was similarly situated to the other inmates who resided in his cellhouse and <u>who</u> ate the regular diet meals which came from the prison's Kitchen.

   The Kansas Department of Corrections' IMPP # 20-101A states: "Each resident is to receive the same quality and portion of food daily."

   Because Mr. Barker worked for KDOC, he had a duty to oblige to this particular regulation of proper policy and procedure; yet, that is not what he did.

   On June 6, 2023 every inmate on the Plaintiff's tier received an opportunity to receive their food, all except the Plaintiff... and the person responsible for that [was] <u>the Defendant Isaiah J.O Barker</u>. Thus, this Defendant can not escape from liability, in connection to the violation of the Equal Protection Clause under the 14th Amendment.


- **Defendants Jeremy Hoepner, Tommy Williams, Darcie Holthaus, and Jeff Zmuda** (and their **liability for**) -

   Each one of the Defendants listed above acted with a wanton disregard by refusing to "properly" investigate the Plaintiff's complaint against the corrections officer Mr. Barker.

   The Defendant Jeremy Hoepner was the first prison official to be confronted with Grievance CA22890. See ~~review~~ Exhibit Z1 Considering the alledgation presented by the Plaintiff, Hoepner had a duty to act as an impartial fact finder in finding out whether or not COI Barker actually did deliberately deny the Plaintiff his last meal of the day. Hoepner did not act impartial; in fact, his approach at locating the truth was quite prosecutorial, mainly because he deliberately refused to review the security footages, as the Plaintiff <u>clearly had requested</u>.

   After Hoepner erroneously denied the Plaintiff's grievance, the Plaintiff appealed that ~~denial~~ denial up to the Warden of EDCF, and the appeal, again, clearly requested for the Warden to simply review the cameras within B cellhouse from June 6th. Just like Hoepner, the Warden Tommy Williams <u>had a duty</u> to properly investigate the complaint by reviewing the security footage to see whether or not Mr. Barker's false accusations were true. And again, just like Hoepner... Williams decided to take his officers word as being golden and denied the Plaintiff's complaint, without reviewing the security footage as the Plaintiff had clearly requested. <u>See Exhibit Z5</u>

   The next Defendants who learned of the incident on 6th of June 2023, was Jeff Zmuda and his "designee" Darcie Holthaus. But not only did they learn of Mr. Barkers misconduct, they also were told about the Warden's and Hoepner's failure to review the security footages, in regard to grievance CA22890. <u>See Exhibit Z2</u>

The Plaintiff stated: "If the camera would have been reviewed, the fact-finder would have saw that COI Barker did not stop at my cell and open my food pass..."

The Plaintiff ended his appeal to the Secretary of Corrections by again requesting/demanding that they simply review the camera footage from June 6th 2023; but before he did that, the Plaintiff put the Secretary of Corrections on notice that civil actions would arise if another denial was issued (without first reviewing the camera)

Despite the policies and procedures, and the logic of his request the Defendants chose to deny the Plaintiff any compensation. See Exhibit Z4.

"On appeal the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong."

It was an unconstitutional error on the part of Darcie Holthaus and Jeff Zmudo to make such an assertion.

At that point, these two defendants had made it obvious that they intended to act with deliberate indifference toward Exhibit Z 2 and Exhibit Z, which absolutely did act as the Plaintiff's argument and also his attempt to establish the necessary evidence.

The result of these prosecutorial denials turns on whether the defendants' conduct indeed did violate clearly established statutory or constitutional rights of which a reasonable person should have known.

(" Prison officials who are under a duty to investigate claims of computational errors in the calculation of prison sentences may be liable for their failure to do so when a reasonable request is made.") Alexander v. Perrill, 916 F. 2d 1392

This court must not confuse the law. "Computational errors in the calculation of a prisoner's prison sentence 'are under the same umbrella as "failures to provide adequate food to prisoners;" because both claims are matters protected by the Constitution; and if ever a claim of either arises the court in Perrill made it clear that a duty to completely investigate is always required... especially when reasonable request are made.

In this case the Plaintiff requested that the security footage be reviewed, and he did so during every phase of his attempts at administrative relief. That sort of request cannot be deemed unreasonable.

The Plaintiff's complaint no. CA22890 consisted of a "he say-she say" dilema. And considering the circumstance, the best investigative tool any of these defendants could've used was " their access to the security cameras."

By reviewing the cameras as the Plaintiff had repeatedly requested, one of these defendants would have saw that the correctional officer Barker was indeed lying and surely had acted with malice toward the Plaintiff, by bypassing his cell during meal pass.

The Defendant Darcie Holthaus mentioned nothing of reviewing their security cameras at El Dorado Correctional Facility; as a reason to deny the Plaintiff the compensation he seeked. She claimed to have spoken to an Unit team Manager by the name of "Lewis", and that according to this "Lewis character" staff tried to wake the Plaintiff; yet, there is no UTM named Lewis who is employed at El Dorado Correctional Facility, let alone involved in the incident which occured on June 6th 2023 in any way; which makes the " conclusions made" in regard to grievance CA22890 extremely ambiguous.

The Secretary of Corrections had a duty to be aware of all of that, yet, not once did he intervene and order someone to review the security footage, as the Plaintiff requested.

It must be pointed out, that this sort of disregard to review security cameras when a prisoner asks prison officials to do so is considered " tacit authorization", which silently permits other prison officials to deny an inmate their meal, for their actions went be seen on cameras.

That sort of tacit authorization is unconstitutional. See Nichols v. Md. Corr. Inst., 186 F. Supp. 2d 575 (quoting Slakan v. Porter, 737 F.2d. 368, 372 (4th Cir 1984)(" A supervisor may be liable if his alleged supervisory indifference or tacit authorization of subordinate misconduct is a causative factor in a persons constitutional injuries. It is correct that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates")

The proper question this court should now entertain is whether these prison officials of "supervisor status" acted wantonly, and obdurately, or with deliberate indifference to the fact there was possibly exculpatory evidence caught on camera, which would've shined light on which party was being truthful, out of the Plaintiff and COI Barker.

The Plaintiff believes he has shown the proof that these supervisors' corrective inaction amounted to a deliberate indifference which can't be disregarded by a court of law. Thus, it should not be a problem to agree that Defendants Jeremy Hoepner, Tommy Williams, Darcie Holthaus, and Jeff Zmuda all violated the Plaintiffs' 8th amendment right by their relevant act of refusing to review the security footage as the Plaintiff had requested.

## Violations of the 14th Amendment

These Defendants' corrective inactions not only infringed upon the Plaintiffs' 8th Amendment right, but also it trampled the Plaintiff's right to Due Process which is governed under the 14th Amendment of the Constitution.

A prisoner's effort at obtaining administrative relief requires Due process of law; because the fact finding process of a grievance is no different than the fact finding process of a prison's disciplinary hearing, and a disciplinary officer shares the same 'duty to investigate' as each Defendant does considering the circumstances.

Whenever a prisoner requests the prison's security camera as (a witness) a disciplinary officer or grievance officer has a duty to look into that prisoner's request; and a failure or refusal to do so constitutes a violation of that prisoner's procedural due process rights. See Walker v. Bates 23 F.3d 652

In Walker v. Bates the inmate requested several witnesses whose purpose was to corroborate the inmate's defense, and it was because that fact finder refused to call those witness, the court deemed his inactions unconstitutional.

The Plaintiff didn't request any other officers or another inmate as a witness, but he did request the security footage to act as his ~~customary~~ corroborating witness in regard to greivance No. CA22890.

if the Defendants would have did what the could by reviewing the camera (as the Plaintiff requested) the findings would have changed the outcome of those attempts at administrative relief and the Plaintiff could've been made whole, for the loss he suffered on June 6 2023, at the hands of Defendant Barker.

The law is simply established - a meaningful investigation was required before the Plaintiff's complaints were denied and his request for compensation refused.

The Plaintiff had a constitutional right to have that 'request-for-review-of-camera' sought out/entertained, yet each one of the these supervisors employed by the KDOC choose to disregard the Plaintiff's right to procedural due Process, by wantonly refusing to review the security footages from June 6, 2023.

This court must agree, the Plaintiff's 14th Amendment right was violated by Defendant Jeremy Hoepner; Defendant Tommy Williams; Defendant Darcie Holthaus; and Defendant Jeff Zmuda~ through the therey of "Supervisory Liability".

## Violation of the 1st Amendment    "Conspiracy-to-cover up" claim

This first Amendment claim consist of an argument of a "conspiracy-to-cover up."

Each prison official of supervisor status is connected to this conspiracy to coverup claim. Specifically speaking, the liability within this claim must fall on Defendants Jeremy Hoepner, Tommy Williams, Darcie Holthaus, and of course the Secretary of Corrections Jeff Zmuda. See Vasquez v. Hernandez, 60 F. 3d 325, 329 (7th Cir 1995) ("stating that the 'cornerstone' to a First Amendment right-of-access claim is 'that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs right of access and that the claim is not actionable where the cover-up failed to achieve such ends.)

if the Plaintiffs case wasn't deemed actionable in the Hernandez proceeding, this Plaintiff's case surely is.

The cover-up tactics in this case didnt fail to acheive such ends, as it obviously did in Vasquez v. Hernandez.

The Plaintiff requested that the KDOC review the security footage during each phase of his effort at administrative relief. Again, See Exhibits Z2 and Exhibit Z

Each reasonable request made by the Plaintiff was disregarded; and it was those wanton disregards which became the main ingredients to the conspiracy at hand here in this claim.

See Orwat v. Maloney. 360 F. Supp 2d 146 (" To establish a cognizable "cover-up" claim, Orwat must establish not only the cover up, but also that the cover-up succeeded.")

See also Gonzalves v. City of New Bedford, 939 F. Supp 921, 926 (D. Mass 1996) : " Stating that cover-up is only actionable if a defendant succeeded in preventing a claimant from discovering or proving a violation of his constitutional rights."

When the Plaintiff filed grievance No. CA22890 he requested that the Defendant Jeremy Hoepner reviewing the camera within his cellhouse, during the time COI Barker distributed the evening meals.

The purpose of the Plaintiff's request was to help the fact-finder discover that COI Barker indeed did deliberately deny the Plaintiff an opportunity to eat dinner.

That discovery, from the security footage, would have proved the Plaintiff's assertions correct - that COI Barker did violate his federal rights by unlawfully denying him a meal, then lying about it In order to cover-up his actions.

When grievance No. CA22890 was denied by the defendant Jeremy Hoepner, the next prison official who decided the complaint was the Warden of EL Dorado Correctional Facility (Defendant Tommy Williams)

Again, the Plaintiff requested for KDOC to look at the cameras from June 6th 2023, for it would show that COI Barker was not telling the truth.  See Exhibit Z1 (then) Exhibit Z5

The Defendant Warden Williams, denied grievance CA22890 without reviewing the cameras, yet stated: " Appropiate steps have been taken to ensure the process has been properly taken." The Plaintiff, scoffs at that notion.

The Defendant Warden Tommy Williams had the opportunity to establish Key facts by reviewing the security footage, yet he choose not to do so, and it was that action which prevented the Plaintiff from discovering and proving the violation of federal rights which occured against the Plaintiff on June 6th 2023.

The Defendants Darcie Holthaus and Jeff Zmuda acted no different than their subordinates; cause they too wantonly disregarded their duty to review the camera from June 6, 2023, despite the Plaintiff's stern request for them to do so.

Accordingly, the Plaintiff not only requested for them to review the cameras but warned them of a civil suit if they once again choose not to. See Exhibit Z2

" Failure to give me what I am entitled to or anything less than what I have requested shall subject you (the Secretary of Corrections) to be held liable in a lawsuit for condoning such behavior which effected my health on June 6, 2023"

The Plaintiff went on further and ended his "arguments" with another request for [them] to do their job correctly. stating :
" In closing I highly recommend this department review the camera footage from June 6 2023 so you can see what I am saying is the truth."

The Defendants Darcie Holthaus and Jeff Zmuda denied grievance No. CA22890 without reviewing the cameras, and as a result their corrective inaction prevented the Plaintiff from discovering proof that a violation of his constitutional rights occured on June 6, 2023.

With regard to Gonsalves v. City of New Bedford, the Plaintiff has satisfied the requirments to show his First Amendment right was violated by Defendants Jeremy Hoepner, Tommy Williams, Darcie Holthaus and Jeff Zmuda.

Each defendant impeded the Plaintiff's ability to "effectively" access the court here in the District of Kansas, because the Plaintiff has come arguing a Eighth violation committed by COI Barker - however, was robbed of the right to obtain the exculpatory evidence needed to show good cause.

See Bounds v. Smith. 430 US 817, 822, 52 L.Ed 2d. 72, 97 S ct 1491, 1495 (1977) " under the First Amendment individuals have a right of access to the courts which must be adequate, effective, and meaningful."

8.

Issue #9

Liability of the Kansas Department of Corrections

Using the claim of "Vicarious-liability", the Plaintiff desires to impliment this governmental entity into this 1983 Bivens complaint, as a standing "Defendant", so it can provide indemnification for the adverse actions committed by its employees over the coarse of two years.

According to certain state and federal laws, this court can allow KDOC itself to be sued for damages. See Spurlock v. Townes, 661 Fed. Appx 536 (10th Cir)

In Spurlock v. Townes the Plaintiffs were permitted to sue the prison employees for their misconduct and the penal corporation those prison officials were employeed by ... which was CCA — "Corrections Corporation of America."

In Kansas, there is state law which makes companies such as the Department of Corrections strictly liable for the "tortious conduct" of their employees. See K.S.A §75-6103-
" Liability of governmental entities for damages caused by employee acts or omissions, when; applicable procedure."
   a.) Subject to the limitations of this act, each goveremental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.

K.SA 75-5201 (two Purpose and Construction) applys mainly to the Kansas Department of Corrections, and clearly establishes the following standards : " The legislative purpose in enacting this act shall be deemed to be establishment of policy of treatment of persons convicted of felonies in this state by placing maximum emphasis on rehabilitation of each such person while in the custody of the state or under the jurisdiction of the courts of the state, consistent with the interests and safety of the public, so that a maximum of persons so convicted may be returned to private life in the communities of the state with improved work habits, education, mental and physical health and attitudes necessary to become and remain useful and self-reliant citizens. It is the intent of the legislature that judges, the secretary of corrections, his or her agents, subordinates and employees and the Kansas adult authority, its agents, subordinates and employees will consrive and apply this act and acts of which it is amendatory or supplemental liberally to rehabilitate, train, treat, educate and prepare persons convicted of felony in this state for re entry or reentry into the social and economic system of the community upon leaving the custody of these state agencies and officers."

According to the facts within this 1983 Bivens complaint, the civil wrongs which were committed against the Plaintiff, over a coarse of two years, were not exclusive condusive to the Plaintiff's improved education, mental health, physical well being, and neither his attitude ; and because so, the Kansas Department of Corrections can not dodge liability.
   See Howard v. Adkison, 887 F. 2d 134 ("A single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability. However, as the number of incidents grew, and a pattern begins to emerge a finding of tacit authorization or reckless disregard becomes more plausible.")
Moreover, and lastly, KDOC [itself] can not hold the entitlement to plead "good faith" as a defense to liability.
   With all said the Plaintiff request the Kansas Department of Correction (as an entity) to be included into this complaint so they can be sued in their individual capacities ... an action pursuant to Spurlock v. Townes 661 Fed Appx 536 (10th Cir)

9.